# United States Court of Appeals
## For the First Circuit

---

No. 22-1101

SARA FRAGA, individually and on behalf
of all persons similarly situated,

Plaintiff, Appellee,

v.

PREMIUM RETAIL SERVICES, INC.,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

---

Before

Barron, Chief Judge,
Howard and Kayatta, Circuit Judges.

---

Jonathan A. Keselenko, with whom James S. Fullmer and Foley
Hoag LLP were on brief, for appellant.
Joshua P. Davis, with whom Shanon J. Carson, Phyllis Maza
Parker, Camille F. Rodriguez, Alexandra K. Piazza, Berger Montague
PC, Jason M. Leviton, and Block & Leviton LLP were on brief, for
appellee.

---

March 3, 2023

---

**KAYATTA**, <u>**Circuit Judge**</u>.  Plaintiff Sara Fraga brought this putative class action alleging that her former employer, Premium Retail Services, Inc., failed to pay her and other employees for time spent working off-site.  Premium, in turn, sought to compel arbitration pursuant to an arbitration agreement that Fraga signed as a condition of her employment.  The district court denied Premium's request for arbitration on the basis that Fraga plausibly alleged facts that placed her within the Federal Arbitration Act's section 1 exemption for workers engaged in interstate commerce.  Premium then filed this interlocutory appeal.  Because the district court has yet to make the findings of fact upon which the question of arbitrability likely turns, we must remand for further factfinding with the benefit of the guidance provided in this opinion.

**I.**

We begin with a summary of the record as it now stands. Incorporated and headquartered in Missouri, Premium provides retail merchandising support to brands at their stores across North America.  Its services include assisting retail stores with stocking inventory, creating merchandise displays, and keeping pricing and signage up to date.  Premium employs "merchandisers" in all fifty states to perform these functions.

Fraga worked as a merchandiser for Premium in Massachusetts from December 2020 to early 2021.[1] Her zone of store locations encompassed stores in Massachusetts, Connecticut, New Jersey, and New York. As a merchandiser, Fraga's duties included traveling to her assigned stores, auditing and stocking product, building product displays, and updating product pricing and signage. Most relevant to this appeal, Premium's job listings for merchandisers stated that merchandisers were also expected to "[r]eceive marketing and promotional materials at your home and bring them to the store." These materials -- which the parties call "point-of-purchase (POP) materials" -- included items like coupons and signage advertising retail products.

Consistent with its job listings, Premium would, at times, ship POP materials intended for specific stores to the homes of its merchandisers, who would then drive the materials to the stores for display. The parties dispute how frequently this occurred. Fraga submitted a declaration stating that "Premium sent these POP materials directly to my home several times per week" and that "[o]n a typical day, I would receive anywhere from a large envelope to more than a dozen boxes of POP materials." She also submitted similar declarations from four other Premium

---

[1] Fraga's complaint alleges that she worked for Premium until January 2021, but declarations she submitted to the district court state that she worked there until March 2021.

merchandisers stating that Premium sent POP materials to their homes "on an almost-daily basis," "several times per week, sometimes daily," "about three times per week," or "two to three times per week."

Fraga describes her typical workday as beginning with about thirty minutes of reviewing assignments and organizing her route. She would then spend thirty minutes preparing POP materials for the day's assignments. This "involved opening each box of POP materials, searching and sorting through the POP materials to find those associated with the day's assignments, and organizing and packing the POP materials into [her] vehicle." After loading the POP materials, Fraga would drive to her assigned stores to perform retail work, "which typically ranged from smaller tasks like building product displays or updating pricing and signage to substantial projects like performing a full 'reset' of [her] assigned brands." Part of her daily duties was "to transport, deliver, and install various POP materials at each of [her] assigned stores." Depending on her assignments, she would spend anywhere from thirty minutes to eight hours in each store. She typically visited four stores in a day, but occasionally visited as many as fifteen. Her daily total travel time between stores typically ranged from ninety minutes to three hours, with an average of about two hours.

Premium, for its part, submitted a declaration from an executive stating that POP materials "are usually sent directly to retail stores, rather than to merchandisers at home.  Premium will on rare occasions send POP materials to a merchandiser's home but this is the exception, not the rule."[2]

According to Fraga, Premium failed to pay her and other merchandisers for their time spent traveling to and between worksites and for their work performed prior to arriving at a worksite, such as mapping out assignments and sorting and preparing display materials.  She also alleges that Premium failed to pay overtime even though she and other merchandisers regularly worked more than forty hours per week.  (Fraga claims to have typically worked sixty-five to eighty-five hours per week.)  She seeks relief for herself and similarly situated Premium merchandisers under the Fair Labor Standards Act (for a national class) and Massachusetts law (for a Massachusetts class).

Premium contends that Fraga's lawsuit never gets off the ground because of an arbitration agreement she signed when she began her employment with Premium.  The agreement stated:

---

[2]  Premium also points us to a California superior court decision noting Premium's contention in that case that only 8.3 percent of the plaintiff's work assignments included a shipment of promotional materials.  See Ruling on Petition to Compel Arbitration, Raney v. Premium Retail Servs. Inc., No. CVRI2203007 (Cal. Super. Ct. Dec. 12, 2022) (adopting in full the court's December 6, 2022, tentative ruling).  The record in this case contains no similar contentions with such specificity.

The Parties mutually agree and consent to the resolution by arbitration of all claims or controversies ("claims"), past, present or future, whether or not arising out of Employee's employment (or its termination), that the Company may have against Employee, or that Employee may have against . . . the Company . . . . The Parties agree that neither of them shall initiate or prosecute any lawsuit or court action in any way related to any claim covered by this Agreement.

Claims that must be arbitrated include, but are not limited to, claims for wages, overtime pay, bonuses or other compensation; . . . claims regarding hours worked or not worked, including overtime; . . . and claims for violation of any federal, state, or other governmental law, statute, regulation, or ordinance (except as provided below).

It also contained a class action waiver stating:

To the maximum extent permitted by law, the Parties agree that all claims covered by this Agreement shall be brought in a Party's individual capacity only, and not as a plaintiff or class member in any purported class, collective or representative action or proceeding on behalf of persons other than the individual Party. . . . If this class waiver shall be determined to be unenforceable, then any class, collective or representative action or proceeding shall be brought only in court, and not in arbitration. The Parties do not agree to arbitration on a class, collective or representative basis under any circumstances.[3]

---

[3] The agreement also included a "severability" provision stating that "in the event that the class waiver is deemed invalid or unenforceable, any claim seeking relief on behalf of a class must be brought in a court of proper jurisdiction and not in arbitration."

Invoking this agreement, Premium filed a motion styled "Motion to Compel Arbitration and Dismiss Complaint," requesting "that the Court dismiss Plaintiff's claims and order her to submit her claims to arbitration on an individual basis." The only ground that Premium advanced for either remedy was the arbitration agreement.

The district court treated Premium's filing as two separate motions: a motion to dismiss under Federal Rule of Civil Procedure 12, and a motion to compel arbitration under the Federal Arbitration Act (FAA). It issued an order on January 31, 2022, denying the motion to dismiss because, drawing all reasonable inferences in favor of Fraga, it found that Fraga plausibly alleged that she fell inside the FAA's section 1 exemption for transportation workers. And if she fit within that exemption, her contract would be beyond the scope of the FAA and would be governed by Massachusetts law, which prohibited class action waivers. And if the class action waiver were unenforceable, the agreement would require any class action to be brought in court, not in arbitration. In the same order, the district court purported not to rule on the motion to compel arbitration, but effectively denied it (at least without prejudice) by ordering Premium to answer the complaint and negotiate a schedule for resolving all issues in the case and setting a trial date.

Premium appeals from the district court's order, arguing that Fraga does not fall within the FAA's exemption. Premium on appeal takes no issue with the district court's application of Massachusetts law or construction of the agreement's terms.

## II.

We first consider a potential jurisdictional hurdle created by the odd procedural posture of this interlocutory appeal. The putative basis for our jurisdiction is 9 U.S.C. § 16(a), which allows for interlocutory appeals from denials of motions to compel arbitration. It does not allow for interlocutory appeals from denials of motions to dismiss. Because Premium styled its motion as a "Motion to Compel Arbitration and Dismiss Complaint," and because the order appealed from purportedly denies only the motion to dismiss while reserving a ruling on the motion to compel arbitration, one could reasonably think that we have before us merely an appeal from a denial of a motion to dismiss, over which we would lack interlocutory jurisdiction.

This is not the first time this issue has come up. Several times, we have treated a "request to dismiss . . . on the ground that the claim is subject to arbitration as a request for an order compelling arbitration." IOM Corp. v. Brown Forman Corp., 627 F.3d 440, 449 n.10 (1st Cir. 2010) (citing Fit Tech, Inc. v. Bally Total Fitness Holding Corp., 374 F.3d 1, 6 (1st Cir. 2004)); see Soto v. State Indus. Prods., Inc., 642 F.3d 67, 70 n.1 (1st

Cir. 2011) ("[W]e may treat a motion to dismiss based on an arbitration clause as a request to compel arbitration when the facts of the case make it clear that the party intended to invoke arbitration."); Sourcing Unlimited, Inc. v. Asimco Int'l, Inc., 526 F.3d 38, 46 (1st Cir. 2008) (reasoning that refusing jurisdiction because defendants sought dismissal rather than to compel arbitration would "elevate[] a label over substance").

We do the same here.  The only basis for Premium's request for dismissal was the arbitration clause in Fraga's employment agreement.  In substance, Premium was asking the court to issue an order precluding further litigation of this case.  And the district court denied that request, albeit leaving open the possibility of revisiting the request on a fuller record. Therefore, we retain jurisdiction over this interlocutory appeal under 9 U.S.C. § 16(a).  See Fit Tech, 374 F.3d at 6 ("Since no one has been prejudicially misled by [defendant's] request for an over-favorable remedy of dismissal, its request for dismissal in favor of the accountant remedy can be treated as encompassing the lesser alternative remedy of a stay and reference.").[4]

_____

[4]  After this appeal was filed, the district court issued an order denying Premium's motion to compel arbitration without prejudice.  Whether the court had jurisdiction to enter such a ruling while the arbitration issue was pending on appeal we need not decide.  We refer to the order only to note that it confirms our understanding of what the district court was trying to do.

That leaves one additional threshold issue posed by the eccentric procedural history just described:  What exactly is our standard of review?  As to any legal questions, our review is de novo.  Cullinane v. Uber Techs., Inc., 893 F.3d 53, 60 (1st Cir. 2018).  As to factual issues, normally we would accept the district court's findings of fact subject only to clear error review.  Rivera-Colón v. AT&T Mobility P.R., Inc., 913 F.3d 200, 206 n.6 (1st Cir. 2019).  But here we have no findings of fact.  And, as we will explain, our analysis of the law indicates that the ultimate resolution of the motion to compel arbitration turns (as the district court presumed) on the resolution of some factual disputes.  We therefore accept only those facts that are effectively undisputed, and otherwise identify those factual disputes that need be resolved, much as if we were ruling on a grant of summary judgment.

**III.**

Enacted in 1925, the FAA declares that written arbitration agreements "shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  Its reach extends to contracts "evidencing a transaction involving commerce," id., a phrase that the Supreme Court has interpreted as effectuating "an intent to exercise Congress' commerce power to the full."  Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 277 (1995).

- 10 -

The FAA also carves out a specific type of contract from its grasp.  Section 1 excludes from the FAA's umbrella "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1. The phrase "engaged in foreign or interstate commerce" in section 1, unlike the phrase "involving commerce" in section 2, "does not invoke the full extent of Congress's commerce power but, rather, has 'a more limited reach.'"  Immediato v. Postmates, Inc., 54 F.4th 67, 74 (1st Cir. 2022) (quoting Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 115 (2001)).  In Circuit City, the Supreme Court rejected the notion that the exemption applies to all employment contracts, stating that the exemption instead must "be afforded a narrow construction," i.e., that it applies only to "contracts of employment of transportation workers."  532 U.S. at 118-19.

Fraga contends that her arbitration agreement is such a contract and that she is a member of a "class of workers engaged in . . . interstate commerce."  Evaluating this contention calls for at least two undertakings:  "We begin by defining the relevant 'class of workers' to which [the worker] belongs.  Then, we determine whether that class of workers is 'engaged in foreign or interstate commerce.'"  Sw. Airlines Co. v. Saxon, 142 S. Ct. 1783, 1788 (2022).  We pursue each undertaking in turn.

- 11 -

**A.**

Decided after the district court issued its order, Saxon provides new guidance on how to define the relevant class of workers.  The plaintiff, Saxon, a ramp supervisor employed by Southwest Airlines, argued most broadly that she belonged to a class of all airline employees.  Id. at 1788.  The Supreme Court rejected this "industrywide approach" to defining the relevant class of workers.  Id.

In so doing, the Court focused on the FAA's use of the word "workers," which "directs the interpreter's attention to 'the performance of work.'"  Id. (quoting New Prime Inc. v. Oliveira, 139 S. Ct. 532, 541 (2019)).  "Further, the word 'engaged' -- meaning '[o]ccupied,' 'employed,' or '[i]nvolved' -- similarly emphasizes the actual work that the members of the class, as a whole, typically carry out."  Id. (internal citations omitted).  Based on this textual analysis, the Supreme Court held that a worker is "a member of a 'class of workers' based on what [the worker] does at [the company], not what [the company] does generally."  Id.

Having rejected Saxon's broad, industrywide approach, the Supreme Court turned its attention to the work that she actually performed.  Id. at 1788–89.  Southwest's ramp supervisors would "train and supervise teams of ramp agents."  Id. at 1787.  Ramp agents, in turn, would "physically load and unload baggage,

airmail, and freight." <u>Id.</u>  "Frequently," however, "ramp supervisors [would] step in to load and unload cargo alongside ramp agents." <u>Id.</u>  Based on the actual work that Saxon and other ramp supervisors performed, the Supreme Court found that she "belong[ed] to a class of workers who physically load and unload cargo on and off airplanes on a frequent basis." <u>Id.</u> at 1789.

A majority of a split Second Circuit panel has read <u>Saxon</u>'s rejection of the industrywide approach to mean only that working in a transportation industry (like air transportation) is not sufficient to satisfy the section 1 exemption. <u>Bissonnette</u> v. <u>LePage Bakeries Park St., LLC</u>, 49 F.4th 655, 660-61 (2d Cir. 2022). The <u>Bissonnette</u> majority then reasoned that working in such an industry is nonetheless necessary for satisfying the exemption. <u>Id.</u>; <u>see</u> <u>id.</u> at 661 ("[W]e conclude that an individual works in a transportation industry if the industry in which the individual works pegs its charges chiefly to the movement of goods or passengers, and the industry's predominant source of commercial revenue is generated by that movement."). Premium urges us to follow the <u>Bissonnette</u> majority. For four reasons, we decline to do so.

First, our own circuit precedent points in the other direction. In <u>Waithaka</u> v. <u>Amazon.com, Inc.</u>, 966 F.3d 10 (1st Cir. 2020), we held that so-called "last-mile" drivers who worked for Amazon.com, an online retailer (i.e., not a transportation

company), were transportation workers covered by the section 1 exemption. Id. at 13, 26. In so holding, we made clear that "we do not hold that a class of workers must be employed by an interstate transportation business . . . to fall within the Section 1 exemption." Id. at 23.

Second, we recognize that Saxon's holding does not strictly foreclose the possibility that being employed in the transportation industry may be a necessary threshold criterion for qualifying as a transportation worker. That being said, Saxon's repeated and emphasized command to focus on what the workers themselves actually do strongly suggests that workers who do transportation work are transportation workers. See 142 S. Ct. at 1788 ("Saxon is therefore a member of a 'class of workers' based on what she does at Southwest, not what Southwest does generally."). Nor is this focus on the workers rather than the employer's industry unique to Saxon, or for that matter even to the Court. See Circuit City, 532 U.S. at 118 (observing that Congress's "demonstrated concern with transportation workers and their necessary role in the free flow of goods" explains Congress's decision "to ensure that workers in general would be covered by the provisions of the FAA, while reserving for itself more specific legislation for those engaged in transportation").

Third, focusing on the employer's business rather than the workers' work would lead to odd results even if (as Bissonette

- 14 -

holds) that focus is limited to a threshold requirement for satisfying the section 1 exemption.  Imagine, for example, a paper company that built a rail link from its mill in New Hampshire to a pulp source in Maine.  One would think that the individuals who operated a train on that railroad would qualify as "railroad employees" under section 1.  Yet Bissonette's reading would exclude them from the exemption merely because a paper company owned the railroad.  And if Bissonette's reading does not work for "railroad employees," then we do not see how it can work for "any other class of workers" either.

Last, even the Bissonette majority seems unwilling to fully accept the ramifications of its reading, purporting to leave undecided the status of workers who transport goods for major retailers.  49 F.4th at 663 (citing Waithaka as an example).

For all of these reasons, we adhere to the view that the class of workers to which a worker belongs for purposes of applying the section 1 exemption is "based on what [the worker] does at [the company], not what [the company] does generally." Saxon, 142 S. Ct. at 1788.[5]

---

[5] This is not to reject the possibility that the nature of the employer's business will inform our assessment whether the work actually performed constitutes engagement in interstate commerce.  See Waithaka, 966 F.3d at 22-23.  For example, the nature of the business may inform, as it does here, whether intrastate transportation is part of an integrated interstate journey.  Id.

Trying a different approach, Premium argues that Fraga does not fall within the section 1 exemption because "there is no special arbitration regime for Merchandisers that was in place at the time of the enactment of the FAA." Premium refers us to language in Circuit City stating that "it is a permissible inference" that Congress excluded seamen and railroad employees from the FAA because specific dispute resolution procedures for these categories of employees already existed under federal law. Circuit City, 532 U.S. at 120-21. From this language, Premium draws the further inference that the section 1 exemption applies only to workers for whom Congress has created alternative dispute resolution procedures.

Circuit City itself belies any notion that the section 1 exemption is so limited. Circuit City recognized that, through the residual phrase "any other class of workers engaged in foreign or interstate commerce," Congress "reserv[ed] for itself more specific legislation for those engaged in transportation" -- even if such specific legislation did not exist at the time. Id. at 121. Said differently, Congress left the door open to provide specific dispute resolution procedures for any type of transportation workers, and in fact did so shortly thereafter by amending the Railway Labor Act to include air carriers and their employees. Id. So workers do not fall outside the section 1 exemption merely because Congress has not yet designed a specific

dispute resolution mechanism for those workers. Indeed, in
Waithaka we held that last-mile Amazon delivery drivers were
covered, even though there existed no legislation providing a
specific dispute resolution procedure for such workers. 966 F.3d
at 13, 26. To hold otherwise would be to render the residual
phrase largely a null set when the FAA was enacted.

That all leaves our focus where Saxon and the text of
section 1 suggest it should be: on the work in which Fraga and
other merchandisers were actually engaged. It is undisputed that,
at times: Premium committed to get promotional materials to
retailers in other states; shipped the materials most of the way
there; and left it to merchandisers to sort and deliver the
materials the remainder of the trip. So at least some work
performed by Premium merchandisers involved sorting, loading, and
transporting goods. But this does not end our inquiry. For
purposes of applying the section 1 exemption, we do not define the
class of workers by pointing to work that is only occasionally
performed. See Capriole v. Uber Techs., Inc., 7 F.4th 854, 865
(9th Cir. 2021) ("[S]omeone . . . does not qualify for the
exemption just because she occasionally performs that kind of
work." (quoting Wallace v. Grubhub Holdings, Inc., 970 F.3d 798,
800 (7th Cir. 2020))). Whether Premium merchandisers belonged to
a class of workers who sort, load, and transport goods therefore
turns on how often they performed that work.

Before the Supreme Court decided Saxon, one might have argued (as Premium does here) that the transportation of goods must be a "central part of the class members' job description" to satisfy the section 1 exemption. Capriole, 7 F.4th at 865 (quoting Wallace, 970 F.3d at 801). In Cunningham v. Lyft, Inc., 17 F.4th 244 (1st Cir. 2021), we drew a distinction between workers "primarily devoted" to an activity and those only "infrequently" so engaged, id. at 252-53, leaving unanswered the classification of those who frequently, but not primarily, engage in that work. Saxon has since made clear that the worker belongs to a class of transportation workers if the worker performs that work "frequently." 142 S. Ct. at 1788-89, 1793.

What does "frequently" mean in this context? Saxon claimed, and Southwest disputed, that she spent "most of her days loading and unloading cargo." Brief of Respondent at 28, Saxon, 142 S. Ct. 1783 (No. 21-309). Rather than resolving this factual dispute in full, the Supreme Court observed that Southwest did not "meaningfully contest[] that ramp supervisors like Saxon frequently load and unload cargo," citing the lower court's observation that Southwest did not controvert the claim that Saxon and other ramp supervisors "'frequently fill in as ramp agents' for up to three shifts per week." 142 S. Ct. at 1788 (emphasis added) (quoting Saxon v. Sw. Airlines Co., 993 F.3d 492, 494 (7th Cir. 2021)).

It therefore appears that in determining that the ramp supervisors qualified as transportation workers, the Court found it unnecessary to determine whether filling in to load and unload luggage was their primary or central duty, or even whether they spent the majority of their time doing that work. <u>Cf.</u> <u>Walling</u> v. <u>Jacksonville Paper Co.</u>, 317 U.S. 564, 572 (1943) (holding that an employee is covered by the Fair Labor Standards Act "[i]f a <u>substantial part</u> of [that] employee's activities related to goods [that] move[d] in the channels of interstate commerce" (emphasis added)). Certainly, the sorting, loading, and transportation of POP materials that Fraga says she performed for two or more hours most every day would seem to be work that was performed frequently by any measure. If this description is accurate, any fair observer of Fraga's workweek would include transportation of goods in describing Fraga's substantial job duties. On the other hand, if Premium is correct that merchandisers delivered materials to the retailers only on "rare occasions," then the requisite frequency would likely be absent. Beyond that, we decline to venture any further refinement of the frequency requirement in the abstract, without the benefit of factual findings that would provide a context for any such refinement.[6]

---

[6] We have no need to consider here how to decide a case in which a task might be performed rarely, yet its performance is the central purpose of the job (such as firefighters putting out actual fires).

All of this is another way to say that the district court's ultimate conclusion was largely correct: Further factfinding is necessary to determine whether Fraga belonged to a class of transportation workers.

To summarize, if the district court finds on remand that Premium merchandisers did not frequently deliver POP materials to retailers, Fraga's FAA exemption argument fails. On the other hand, if the district court finds that sorting, loading, and then transporting POP materials to retailers were frequently performed job duties, the court will then need to decide whether the merchandisers were "engaged in . . . interstate commerce" within the meaning of section 1 when they performed those duties. We turn next to explaining how to answer that latter question.

**B.**

To be "engaged in" interstate commerce, a class of workers "must at least play a direct and 'necessary role in the free flow of goods' across borders." Saxon, 142 S. Ct. at 1790 (quoting Circuit City, 532 U.S. at 121). That is, the class of workers "must be actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." Id. (quoting Circuit City, 532 U.S. at 121).

In Waithaka, we distilled three categories of workers who could potentially be "engaged in" interstate commerce under section 1: (1) "workers who themselves carried goods across state

lines"; (2) workers "who transported goods or passengers that were moving interstate," "even if the worker's role in transporting the goods occurred entirely within a single state"; and (3) workers "who were not involved in transport themselves but were in positions 'so closely related' to interstate transportation 'as to be practically a part of it.'"  966 F.3d at 20 (quoting Shanks v. Del., Lackawanna, & W. R.R. Co., 239 U.S. 556, 558 (1916)).[7]

To the extent that Premium's merchandisers were engaged in interstate transportation while delivering POP materials, the record as it now stands supports a finding that the merchandisers' sorting and loading of those materials were practically parts of that transportation.  As to whether the merchandisers were indeed engaged in interstate transportation, there is evidence that at least some merchandisers (including Fraga) actually drove goods across state lines.  How many merchandisers did this and how frequently it occurred is unclear from the record.  Separately,

---

[7] Although in Waithaka we reserved judgment on whether workers in the third category can fall within the section 1 exemption, 966 F.3d at 20 & n.9, the Supreme Court in Saxon later clarified that they can.  Saxon held that airline cargo supervisors -- who loaded and unloaded cargo onto and off of airplanes but did not themselves transport the cargo -- fell within the exemption because they were, "as a practical matter, part of the interstate transportation of goods."  142 S. Ct. at 1789; see id. ("We have said that it is 'too plain to require discussion that the loading or unloading of an interstate shipment by the employees of a carrier is so closely related to interstate transportation as to be practically a part of it.'" (quoting Balt. & Ohio Sw. R.R. Co. v. Burtch, 263 U.S. 540, 544 (1924))).

there is Fraga's claim that even the intrastate trips by
merchandisers were parts of interstate journeys. To determine
whether that claim has merit, we look to our case law delineating
when a class of workers transporting goods or people intrastate is
engaged in interstate commerce.

We begin with Waithaka, which held that last-mile
delivery drivers for Amazon were engaged in interstate commerce,
even though their "role in transporting the goods occurred entirely
within a single state." 966 F.3d at 20. Drawing from cases
interpreting the Federal Employers' Liability Act (FELA), we
reasoned that in some circumstances workers can engage in
interstate commerce by "transporting goods that had come from out
of state or that were destined for out-of-state locations." Id.
The FELA cases supporting this reasoning involved railroad workers
on trains hauling goods in the intrastate portion of an integrated
interstate journey. Id. at 20-21 (citing Seaboard Air Line Ry. v.
Moore, 228 U.S. 433, 434-35 (1913) and Phila. & Reading Ry. Co. v.
Hancock, 253 U.S. 284, 285-86 (1920)).

We shed light on what it means for an interstate journey
to be "integrated" in Cunningham, which involved rideshare drivers
for Lyft who transported passengers to and from Logan Airport in
Boston, Massachusetts. 17 F.4th at 250-51. We concluded that
such a trip was not part of an integrated interstate journey, but

rather was a separate and independent intrastate journey taking place before or after the passenger's interstate journey.  Id.

Informing our analysis in Cunningham were two scenarios considered by the Supreme Court in United States v. Yellow Cab Co., 332 U.S. 218 (1947), overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 759-61, 770-71, 777 (1984):

> The first scenario involved the transfer of passengers and their luggage between rail stations in Chicago.  At the time, most passengers traveling interstate by rail through Chicago were required to disembark from a train at one station and travel up to two miles to board another train at another station to continue their interstate journey. The railroads often agreed with their passengers to provide transit between the two stations.  The railroads then contracted with cab companies to supply the vehicles and drivers for this connecting transit.
>
> The second scenario involved taxi cabs in the course of their normal local taxi service throughout Chicago arranging with passengers to drive them to or from various locations, including the rail stations at the beginning or end of their rail journeys.

Cunningham, 17 F.4th at 250 (internal citations omitted).  The Supreme Court held that the taxi service in the first scenario was "clearly a part of the stream of interstate commerce" because the intrastate trip between rail stations "must be viewed in its relation to the entire journey rather than in isolation" and, "[s]o viewed, it is an integral step in the interstate movement." Yellow

Cab, 332 U.S. at 228-29.  As we explained in Cunningham, "[t]his
made common sense:  The typical passenger undoubtedly viewed his
or her trip as one interstate journey, with the mid journey
transfer smack within the flow of that trip."  17 F.4th at 250.
In the second scenario, by contrast, the taxi service to and from
the rail stations was "not a constituent part of the interstate
movement," but rather was "quite distinct and separate from the
interstate journey," which began when the passenger "board[ed] the
train at the station and . . . end[ed] when he disembark[ed] at
the station in the city of destination."  Yellow Cab, 332 U.S. at
231-32; see Cunningham, 17 F.4th at 250.

        The Lyft drivers in Cunningham were more similar to the
cab drivers in the second Yellow Cab scenario than those in the
first because they "contract[ed] with the passenger as part of the
driver's normal local service to take the passenger to the start
(or from the finish) of the passenger's interstate journey."
Cunningham, 17 F.4th at 250.  Moreover, "[t]he airlines [did] not
agree to provide the relevant ground transit, and . . . neither
Lyft nor Lyft drivers contract[ed] with the airlines to help the
airlines perform such an undertaking."  Id. at 251.  We
distinguished Cunningham from Waithaka on these grounds:

> Our decision in Waithaka is not to the
> contrary.  There Amazon (like the railroads in
> Yellow Cab) agreed with Amazon customers to
> transport goods interstate from their point of
> origin to the customer's home.  The local

> delivery drivers (like the taxi companies in
> the first scenario of Yellow Cab) then agreed
> with Amazon to carry the goods for a portion
> of that single interstate journey ("the so-
> called 'last mile'"). Here, by contrast,
> there is no evidence of any such agreements
> between Lyft and the airlines.

Id. (internal citations omitted).

This background then informed our opinion in Immediato,

where we summarized our prior analysis:

> The term "engaged in foreign or interstate
> commerce" in section 1 can apply to workers
> who are engaged in the interstate movement of
> goods, even if they are responsible for only
> an intrastate leg of that movement. See
> Waithaka, 966 F.3d at 26. Their work, though,
> must be a constituent part of that movement,
> as opposed to a part of an independent and
> contingent intrastate transaction. See
> Cunningham, 17 F.4th at 251; see also Yellow
> Cab, 332 U.S. at 231.

54 F.4th at 77.

Against this background, we held that couriers who

delivered goods intrastate from restaurants and grocery stores to

consumers who ordered those goods from the restaurants and grocery

stores were not engaged in interstate commerce for purposes of

section 1 of the FAA. Id. at 80. Although the goods had traveled

interstate to reach the restaurants and grocery stores, that

"interstate journey terminate[d] when the goods arrive[d] at the

local restaurants and retailers to which they [were] shipped."

Id. at 78. The couriers' subsequent intrastate deliveries of the

goods from the restaurants and grocery stores to consumers were

"part of entirely new and separate transactions" that were "not themselves within interstate commerce." Id. We distinguished Waithaka because in that case "customers bought goods directly from Amazon, which orchestrated the interstate movement of those goods and arranged, as part of the purchase, for their delivery directly to the customer." Id. In Immediato, by contrast, "the goods [were] purchased from local vendors -- and at that point, the goods [had] already exited the flow of interstate commerce" because "the interstate movement terminated when the goods arrived at local restaurants and grocery stores." Id.

These cases suggest that the contractual relationships among the various actors play an important role in determining whether an intrastate trip is part of an integrated interstate journey. In Waithaka, Amazon contracted with its customers to get the goods to them, and also contracted with the last-mile delivery drivers to complete that interstate journey. Similarly, in the first Yellow Cab scenario, the railroads contracted with travelers to provide transport between the rail stations, and also contracted with the cab companies to provide that transport.

By contrast, in Immediato, the companies who sent the goods interstate to the restaurants and grocery stores had no contractual interest or obligation in the delivery of those goods to consumers by couriers. That delivery occurred in an entirely separate intrastate transaction. Similarly, in Cunningham, the

airlines had no contractual relationship with the Lyft drivers or passengers regarding the passengers' local rides to and from Logan Airport.  Nor did the railroads in the second Yellow Cab scenario have a contractual relationship with the cab companies or passengers regarding the cabs' local service to and from the rail stations.

In line with the foregoing, on remand the district court should determine whether the merchandisers' transportation of the POP materials to the retail stores is more like the transportation in Waithaka and the first Yellow Cab scenario or more like the transportation in Immediato, Cunningham, and the second Yellow Cab scenario.  For now, all we need to say is that we reject Premium's argument that the record as it now stands categorically forecloses a finding that Premium's merchandisers engaged in interstate commerce when they transported the POP materials intrastate.  To the contrary, the current record would support a finding that Premium had a contractual relationship with the retailers under which it agreed to perform services that included the delivery of POP materials to the retailers.  The record would also support a finding that Premium had a contractual relationship with the merchandisers under which (with a frequency yet to be determined) Premium required them to, among other things, deliver those POP materials to the intended retailers.  If the factual findings made on remand confirm this view of how the transport of POP materials

occurred, then the journey of the POP materials from Premium to a
merchandiser's home, and from the merchandiser's home to the
designated retailer, was an integrated interstate journey.

This conclusion comports with common sense. Suppose,
for example, that Premium, having agreed to deliver materials to
retailers, hired a third-party delivery service to transport the
materials from Premium to each out-of-state retailer. No one could
reasonably dispute that those trips would be integrated interstate
journeys that included the last few miles driven, even if different
drivers covered different legs of each trip. See Waithaka, 966
F.3d at 20. Premium's use of its own employees to carry the
materials for the last part of each interstate journey does not
turn the journey into two unconnected trips. Certainly Premium
would not tell a retailer that it had completed its delivery
commitment when the goods arrived at the home of a Premium
employee. In Immediato, by contrast, the out-of-state sources of
the restaurants' foods undoubtedly would not have regarded their
goods as still being in transit after they arrived at the
restaurants.[8] Moreover, in this case, the record would support a

_____

[8] One can imagine Premium providing a retailer a link to
track the shipment of its POP materials, which would reflect that
the materials were still in transit after arriving at the
merchandiser's home. By contrast, an out-of-state food source in
Immediato would not send such a link to a consumer, because it has
no idea which consumers will ultimately receive its food products.
Rather, it would send the link to the restaurant that ordered the

- 28 -

finding of fact that the POP materials -- from the beginning -- were all destined for particular retail stores. Indeed, when Fraga received the materials, she would sort them by intended destination. So at the time the materials left Premium, it would appear that one could determine which materials were destined for which stores. Under these circumstances, any sensible person looking at the situation would understand that the materials underwent a single journey from Premium to the retail stores, with a "last-mile" layover at the merchandisers' homes.

Premium argues that applying the section 1 exemption in such a manner would open the floodgates and sweep into that exemption "any worker who receives out of state shipments for later use in their primary job," including, for example, an "electrician [who] worked for an out-of-state company who shipped parts to her house for use on the job." And as Premium points out, the section 1 exemption in the FAA is "afforded a narrow construction" that is not intended to sweep in all employment contracts. <u>Circuit City</u>, 532 U.S. at 118.

Premium's example and its floodgates argument generally overlook the important point that we have just made: As best we can tell on this record, the POP materials began their interstate journeys intended for specific retail stores as part of Premium's

---

food, and the link would reflect the completion of the shipment upon delivery to the restaurant.

contractual obligations to deliver materials to those retailers. If that is so, then the journey resembles that of a book that leaves an Amazon warehouse in New York headed for a particular purchaser in Massachusetts via a local Massachusetts driver who will see to it that the book completes the last mile of its interstate journey. See Waithaka, 966 F.3d at 13, 20-21. Premium's electrician example more closely resembles an out-of-state delivery that ends in the electrician's general inventory, followed by an in-state trip to a customer's home when the electrician later determines the part is required -- much like the two journeys taken by, e.g., a bag of potato chips in Immediato. See Immediato, 54 F.4th at 78; cf. Jacksonville Paper, 317 U.S. at 569-70 (holding that goods ordered by a wholesaler based on anticipation of need, as opposed to "pursuant to a prior order, contract, or understanding," may no longer be traveling in interstate commerce when delivered to the wholesaler's in-state customers for purposes of the Fair Labor Standards Act).

Of course, if what Premium has in mind with its example is a class of workers who complete deliveries of light fixtures shipped from out of state to homeowners who order the fixtures from an out-of-state manufacturer, then we see no reason why those workers would not be within the section 1 exemption merely because they are electricians who also install the fixtures -- assuming that the workers complete such deliveries on a frequent basis. We

question, though, whether many electricians have substantial job duties that can be reasonably described in this manner.[9]

That the section 1 exemption today might include many more "transportation workers" who are not seamen or rail workers than it did in 1925 -- such as people who frequently load luggage onto airplanes or perform last-mile deliveries of merchandising materials shipped from out of state -- does not mean that the exemption is no longer construed narrowly. Rather, it merely reflects that many more workers fit into that narrow exemption because many more goods travel many more miles by air and road than was the case in 1925.

Finally, we do not address Fraga's alternative argument that Premium merchandisers satisfy the interstate commerce element of the section 1 exemption because they themselves sometimes drove across state lines to deliver POP materials. The district court may address this argument on remand once it determines how many merchandisers made such trips and how often they did so.

---

[9] There may be other reasons that, on the facts of a particular case, an electrician similar to the hypothetical one Premium describes does not fall within the exemption. Because we find the lack of an integrated interstate journey sufficient to resolve Premium's floodgates concern, we do not address whether, under more specific facts, a particular electrician would fall within the exemption.

**IV.**

The district court ended up mostly in the correct place: More factfinding is required to decide whether to compel arbitration. We say "mostly" only because the district court should have finally decided the arbitrability issue before allowing any litigation on the merits. Otherwise, it is effectively denying Premium's motion by forcing Premium to litigate the merits of the case. We therefore <u>vacate</u> the district court's order to the extent it is inconsistent with this opinion and <u>remand</u> for further proceedings consistent with this opinion. No costs are awarded to any party.